Good morning, Your Honors. I'm Ronald Peck of Shannonian Peck, and I represent the appellant James Jardine, the building owner with the claims against the two insurance companies in this case, his own insurance company, Maryland Casualty, and one of his tenants' insurance companies, Employers Fire. As you know, these are appeals of summary judgment rulings in four separate related matters, both of which, though, can be sort of grouped together as the wall claim and the fire claim. And so we'll talk about those. I'd like to spend approximately ten minutes on my opening argument and reserve the balance of the time to respond to the insurance company's claim, if that's possible. First, I'd like to address the wall claim and the trial court's ruling that Mr. Jardine's claim against the insurance companies was excluded under a deterioration exclusion in the policy. I won't spend a lot of time concerning how the problem occurred, because in this case the experts were in agreement that the plaster applied by the one tenant interacted, the chemicals in that plaster interacted with the water that came through this block wall, formed etrogenide or crystals that expanded and then caused this damage. This building had been standing there for 50 years without problems on the south wall until such time as this tenant actually put that plaster on the inside of that south wall. So why doesn't Berry apply then? Well, Berry doesn't apply for four reasons. The first one is in Berry, unfortunately, it is such a limited discussion. It's a footnote, as you know, footnote three, that really just alludes to this, but then concludes that's not a ground for applying or basically denying the claim. The four reasons, three of which are legal, one of which is practical, I think. First in Berry, there's no definition of what the policy includes or excludes. You won't see that there. In our case, there is a specific definition. It says that it needs to be one of a variety of things like rust, deterioration or some condition in the property that causes it to damage or destroy itself. So, for example, if there was metal that wasn't properly treated and it rusted, that's in the nature of an excluded claim. If it's a building like this one that wasn't built properly or wasn't maintained, that's an excluded claim. In Berry, there's no discussion about what the policy said. And so it's our position that at least as a starting point, you'd look at what the policy said. And if, in fact, some tenant putting plaster that for the first time after 50 years causes damage to your wall and it does it in a short period of time, that's not deterioration. Berry doesn't even discuss that issue. You have those facts in this case. Separately, in Berry, as the Court recited the time frame, it was two years and seven months. The evidence in this case shows as to Maryland Casualty, Mr. Jardine's own insurance company, the damage occurred in May, it was at least observed by one of the witnesses, in May 2006, 11 months after the plaster was actually applied. Well, that, but, all right. Relative to, you've got what, the two insurance companies on Maryland, the plastering happened after the Maryland policy came into effect, correct? No question. With employers. I'd be clear, it happened during the policy period. Right, but the policy preceded the plastering happening. It did. With employers, the plastering had happened before. Yes. It did that. So isn't that different? No. Actually, that was the focus of their first motion for summary judgment, which Judge Conte denied, because it's not when the plaster was applied, it's when the damage manifested itself. And so you get into the whole issue of when the manifestation occurred, which of the standards applied. Here, Mr. Jardine is not only making a claim, because he's a named insured under the employer's policy, but he's also making a third-party liability claim, which makes the Montrose 2 case apply. That's our position. The judge basically said, look, when this thing showed up, that's a disputed fact. I'm not granting summary judgment. So to answer your question specifically, in this case, right now on this appeal, employers is in the same position as Maryland Casualty. And to follow through with your first question, you're right. Whereas Maryland Casualty is responsible for the back wall, the front wall, and the middle wall, and that manifested itself within 11 months, that's far shorter than the Berry case, and that's just one other ground to distinguish the Berry case from our case. As to employers, though, you are right. The front wall deterioration didn't show up until two years and four months after the application. But it's still our position, that's shorter than Berry. And separately, it's our position, as we've argued in our brief in the employer's appeal, the deterioration exclusion doesn't even apply to employers. Mr. Jardine is a third-party claimant against the tenant making a claim. There's an extender endorsement that specifically states that the exclusion, exclusion J, dealing with the deterioration, does not apply to third-party claims like the one that Mr. Jardine is making. It seems like there's sort of a little bit of an elephant in the room here, and that being that eventually this property was condemned and your client got a substantial amount of money for this. Not enough. Well, so tell me why, for example, one of the things he's claiming now on, that he didn't get code upgrades for things that he never did. So why aren't some, why aren't the things that he's asking for a windfall in that, you know, for example, he's asking for code upgrades that he never actually did, and it appears that he settled for $39,000 or, you know, something to a certain amount, and then he now wants code upgrades that he never, never was, never did, never was going to do or whatever. No, he planned to do, no question. You're, first of all, the code upgrade issue is, you're right, part of the wall issue, but we never got there because the judge basically said the Berry case somehow prevented this different type of case from allowing a claim for wall damage. But to go to the fire issue, which you're raising, when you have a claim, an insurance claim, you have to base the decision of whether it's covered or not based on the date of the claim. You can't wait three, two or three years later and say something subsequently happened, so now we're entitled to deny your claim. In fact, if we were allowed to get to that point, the evidence would show that the payment that the city made was for the moving of Mr. Jardine's business, his lost goodwill, the value of the land having nothing to do with the building, having to do with the building in the back of the property, and having to do with the property in its existing condition in September 2009 after the tenant had damaged this wall, and after the insurance companies had denied paying other than a nominal amount for the fire loss, nothing for the wall damage. And so, first of all, factually, that has nothing to do with this case, even though the amount is substantial. It's a big property, big lot, big building. It would have been more, that's our position, if we were allowed to go there. Separately, you really can't decide whether a claim is properly adjusted and paid based on facts that happened three years later, because otherwise insurance companies either would get the benefit of waiting if a property value, for example, went down, or they'd suffer the detriment if, in fact, the value of the building went up. That's why the law is real clear. It's the cost of repair or the fair market value at the time of the loss, whichever is less, not value three years later. That's the answer. So finishing up your original question about Barry and why it's distinguishable, again, besides the fact the policy in this case we contend is different, we don't know about Barry because they didn't discuss it, besides the fact that in Barry it was two years and seven months, whereas as to Maryland Casualty it was only 11 months, significantly shorter, and as to employers, although it's closer in time, it's still shorter. For employers, there is this extender endorsement that excludes the deterioration claim anyway. Next, in Barry, they actually allowed the claim because, as you know, under that Sabella analysis, they found there was a different efficient cause, so they said that the claimant was entitled to be paid under the policy, and that deterioration issue that came up in that case, in the footnote, wasn't even decisive in the case, whereas in our case, it's the result, it's the only reason why Judge Conte denied Mr. Jardine's claim as to the wall. And the last one, and this one, it's practical, probably not legal, but practical, in Barry, the insured property owner is the one that actually poured the stuff on the pipes. In this case, Mr. Jardine basically came in a period afterwards and discovered that his tenants, a third party, had caused this damage on his property. So whether it's legal or just moral or just practical, our case is very different, and he shouldn't be bound by some deterioration exclusion, which under the terms of the policy, under the terms of, let me, Murray and Butkey, two of the cases, are significant California State Court cases. One was 17 years before the damage showed up. One was 20 years before the damage showed up. Barry is the first case to ever hold that something happened this quickly. And again, it's a footnote. It's not dispositive. In Barry, the Court talked about, cited two cases that said it's okay that even though it's a cause that comes from the outside, that that still could be deterioration. Now, you only have four minutes left. Do you want to reserve that? I'll finish this thought. Okay. It's up to you. Your time. In those two cases, they were talking about acid in the soil at the time the building was built and was in existence at the time the policy was placed, not something that was an exterior cause that happened at much later time, as is our case here. So I just think that Barry is distinguishable. It shouldn't be — it's questionable by itself, but it definitely shouldn't be extended in this case. And we'd hope you'd agree and overturn the judges' summary judgment rulings. Thank you. Thank you for your argument. Good morning. Good morning. May it please the Court. My name is Jonathan Gross. I am here on behalf of Maryland Casualty. I'd like to save — You don't get to save any. Oh, not for myself. Oh, okay, for your colleague. Because I know there's some specific issues. Well, how much time do you want to give him? How are you dividing your time? We haven't really decided that. Four to five minutes. We agree on 10 to 5. Yeah. Okay. So just so that you know, seated at the table, when he gets down to 10, I'm going to ask you to sit down so that he doesn't have to squirm in his seat as you use up his time. Okay? Fair enough, Your Honor. Thank you. All right. All right. You can proceed now. Thank you. I am sure the Court has lots of questions because the briefing is similar probably to a law school test with all kinds of issues. I will start with one, but I will invite the Court to address any questions that it has. The issue I'd like to start with, which I think is the heart of the Wall claim, is whether the damage to the Wall was slow-moving. Under the California court decision of Brodkin, that's the standard. The standard isn't how much time it takes to discover. It's whether the damage is slow-moving. Well, I guess essentially the proximate cause of the plaster damage here is the Tenet's Act of applying the wrong plaster, right? Actually, no. And the both sides agree that the proximate cause is the ettringite crystals that were growing in the wall between the plaster and the CMU brick wall. Now, a causation of it getting there, of course, is what the Tenet's did, but the parties have agreed that it's the ettringite crystals that is the efficient proximate cause of the damage. The parties also agree with the fundamental facts about how the crystals got there. The crystals got there because of a confluence of three factors. You have the water coming through the concrete wall, you have the chemistry of the concrete wall, and you have the sulfates in the gypsum plaster that was applied to the wall. And so as a result, between the plaster and the concrete wall, the CMU wall, ettringite crystals grew. It's also agreed in the briefing that the damage to the plaster is not covered. Well, so are you essentially contending that the plaster claims are barred under the renovation exclusion because the faulty renovation here resulted in deterioration, which is not a covered loss? Yes, and Judge Conte agreed. And not only did Judge Conte agree, but actually in the briefing, Mr. Jardine also agrees that the renovation exclusion bars the coverage for, excludes coverage for any damage to the plaster itself. So the only question here is the damage to the CMU brick wall. And then applying these undisputed facts of the fact that the damage is caused by crystals growing between the plaster and the wall, the first thing that's noticed 11 years after the plaster, excuse me, I wish it was 11 years, 11 months after the plaster was put on the CMU wall is a little bubbling, little bumps in the plaster. And the reason is that as the crystals grow, it's not going to push the concrete wall anywhere because that's very solid, but the 16th of an inch of plaster is going to get pushed out by the crystals. So at 11 months, all that is noticed is damage to the plaster. Now, what's undisputed is at the same time, the crystals are also embedding themselves in the air pockets, the voids in the CMU wall. And of course the crystals over time are going to grow, and as they grow in those air pockets, they attach themselves and soften the CMU wall. But this takes years. And so the real question under Brodkin is, is this damage to the CMU wall, not the plaster, to the CMU wall, is it slow moving? And we would submit that there is no question that it's slow moving because even at 11 months, the only damage that is observed is the bubbling, a little bit of bumps on, at certain places in the plaster. And the evidence shows that it is not until, that's in May of 2006, it's not until November 2006 that Mr. Jarjean notices any damage to the wall and giving him every benefit of every inference, then that may be the CMU wall. And he doesn't even say that there's substantial damage to the CMU wall until I believe it's 2007, in November 2007, which is more than two years later. So is this slow moving? Well, I would make a comparison to glaciers. Glaciers are the epitome of something that is slow moving, and glaciers move a matter of inches, sometimes feet per year. Here what you have is something that grew maybe a tenth of an inch, just a fraction of an inch, up to maybe a quarter, you know, in time, up to a quarter of an inch several years later. This is by definition slow moving. I would also like to point out that the expert for Mr. Jarjean, a gentleman named William Jones, in every paper he submitted, every opinion, even his testimony, he calls it deterioration. So there is no material dispute that this was a slow moving deterioration of the CMU wall. Okay. I know there's a lot of other issues, and I can, but I think they're all fairly well briefed. Are there any questions on this, or are there other issues in the brief that I can address for the Court? We don't appear to have additional questions. So if you want to give the time to your co-counsel. I think I will do that, since we're getting close to it anyway. Thank you.  Good morning. It's interesting. Jarjean begins his discussion by saying the experts agree about the damage mechanism here. And I agree the experts agree. We all agree what happened here. We also all agree, and I don't see any disagreement either in the papers or the argument, that the type of loss we're dealing here is progressive in nature. It's an interaction between water and concrete and different chemicals, and over time the condition in the wall progresses and gets worse. As such, we're dealing with a progressive continuous loss. So on the first-party side of things, we're guided by prudential LMI, which tells us there can only be one, only one carrier once a loss manifests. In a first-party property damage case, progressive loss, only one carrier can be on the risk. Judge Conte in our case said there can only be one, only one carrier once a loss manifests, and that's what we're dealing with here. And I'm not saying there can't be one, only one carrier. No, no. And I am addressing that as a separate and independent basis for this Court to uphold the judgment as to employers. The employers' policy has the same deterioration exclusion, the same renovation exclusion as the Maryland policy. We've briefed that. We're satisfied with the briefing. The discussion regarding an extender endorsement by Mr. Peck's own admission relates only to Mr. Jardine's 11-580 claim, the direct action claim. I'm not discussing that right now. Right now I'm addressing the independent basis for upholding the judgment as to employers, which is Judge Conte was in error when he found that the back two portions of the wall, the loss manifested prior to the employers' policy, so therefore Jardine could not claim for the last two, for the back two-thirds. But somehow held that Jardine could still claim for the first portion of the wall because of a question of fact about whether damage had manifested to that portion. I submit to you that that analysis is in error, because only one carrier can be on the risk for a continuous progressive first-party loss. Jardine tries to we think the case is right on fours with HOME. HOME is the Hotel del Coronado case where they're spalling to some of the concrete and some of the balconies during the first policy period, and then the second policy period they're spalling to more balconies, and the plaintiff there tried to split the loss. And the court said you can't split the loss. Once it's begun, it's begun. And if it continues in kind, the loss still relates back to the initial period. The attempt to distinguish HOME is by saying it's a pre-prudential LMI case and it confused first- and third-party jurisprudence, except that prudential LMI wholeheartedly accepts the first-party analysis in HOME and says it's another case that formed the basis for its only one-manifestation rule. After HOME, we cited the course to SAPIRA, which is a Judge Patel decision from 1994. That's a very good post-HOME case. We cite it on page two in four of our brief. We did not discuss it at great length, which is why I'm addressing it here. SAPIRA was a case where there was a single-family HOME was completed in the 1970s. There was an allegation of ongoing property damage. And COMPASS insured the HOME in 1982, and it was not until 2002 that the homeowner discovered the loss, the loss manifested in 2002. And Judge Patel said that only the carrier-owned HOME risk during manifestation could be held, and therefore granted in COMPASS's motion to dismiss because it was a pre-manifestation carrier. Judge Patel, in reaching her ruling, cited approvingly to the Larkspur Homeowners Association case. That was not discussed in our brief. I'm addressing it at this point because I find that to be a deficiency in our brief. Judge Patel relied on Larkspur. Larkspur was, again, another continuous damage case. Water damage begins in 1972, manifests in 1985, in 1981, excuse me. In 1985, TRUX insures the first-party policy, and within a year or two, plaintiffs discover that not only were they having water damage, but the water damage may have resulted in a release of asbestos fibers. In other words, a new type of loss arising out of the same set of facts. The Larkspur court granted Trutz's motion to dismiss as it was being a post-manifestation carrier, even though there was a different type of damage that was being discovered later. And the Larkspur court held that splitting the loss into separate losses, exactly like Judge Conte did here, would result in a new loss potentially covered by a different insurer, whenever the insurer discovered a new increment of progressive damage. Such a result would be... I want to ask you this, just because you're talking about this, I don't want to forget to ask you, that part of this case was published, right? Part of... There was a Jardim v. Maryland casualty part. Maybe it wasn't your part? I'm unaware of that, Your Honor. I think part of the district court published in part of this, I think. In Maryland. In Maryland. So does that part being published, in terms of our decision to publish, does that affect you? I mean, is there anything wrong in that? No. I mean, here's the thing. We have two defenses. We have all of Maryland's defenses, because we have the same exclusions. And then we have a very simple argument, which is we're a post-manifestation carrier. There can't be two of us on the risk for the same loss. And this is the same loss. It's really, really as simple as that. Are you going to talk about the third party? If you'd like. Well, if there's no further questions here, the third party, Your Honor, I think is a lot easier. Because the third party, there's no issue about what Jardim knew or didn't know. The only thing that's required under the third party is that Jardim knew or didn't know of any part of the loss prior to the inception of the policy period. So Jardim has already admitted that he saw damage to the first two sections of the wall prior to the policy period. By its terms, that's enough for us to win. But we have more than that. Which is because if a loss begins during the policy period but continues on, it is deemed to have begun when it commenced. That's the third party language. So that because of the loss, it's uncontested that two-thirds of the wall were exhibiting damage prior to the policy period, that in and of itself defeats the third party claim. But we have a better case than that. The named insured who paid the premium swore under oath by way of declaration and then under deposition, with Jardim having the opportunity to cross-examine, that all portions of the wall were damaged the moment that she took over the leasehold, and that was prior to the inception of the policy period. So if the admission of our first named insured that the entirety of the loss was known prior to the policy period, and the admission and finding of fact by Jardim in the district court, the two-thirds. So that takes care of the 11-580 action, because in the 11-580 action, all coverage defenses are preserved. We've preserved these coverage defenses. We asserted them and Judge Conte ruled in our favor on them. I'll stop there. I'm going to save my last minute, unless there's further questions. Kagan. There don't appear to be any additional questions. Thank you. Thank you. I think I'll begin with the last question and then move to the first portion of the discussion. As to the third party claim and counsel's discussion of the judge's first summary judgment ruling, first of all, that ruling was an appeal. That isn't an issue here. There the judge found that the construction of the building was in dispute. That is, is there one long wall or are there three separate walls separated by perpendicular walls so that each wall was affected differently? There were a number of other issues, but that's the most significant one. He concluded there was a sufficient conflict in the evidence that he could not grant summary judgment. So on the third party issue, the fact that Mr. Jardim is making a claim as a third party, it is for that front wall which the judge already determined there was a conflict of evidence, a conflict in the evidence concerning. Separately, on this one, the insurance company attorney wrote up a declaration. She signed it. She said, I knew about this before the employer's policy started. Mr. Jardim's declaration says he was in the building in the summer of 2007 after the policy started. He saw the wall. There was no damage. The argument was, well, you can't say what Mrs. Pardo knew or didn't know. We don't have to. If, in fact, he saw it and there was no damage, then there's a conflict in the evidence between what she claims and what he actually saw, and therefore summary judgment even on the third party claim should not have been granted, even under the theory that's argued now. Judge, you asked the question about wasn't this caused by the tenant putting the plaster on the wall? And there was a kind of roundabout discussion. The answer to your question is yes. The chemicals in the plaster interacting with the water coming through the wall is what caused this problem. That water came through the wall for 50 years. It never caused a problem on that south wall of the building. It wasn't until the tenant put up that plaster, then the chemicals reacted, the etrogenite was formed, and the damage was caused. And that's something that within 11 months for that, the back wall and the middle wall manifested itself. The bubbling occurred at 11 months. As far as the evidence showed, the experts said the bubbling was the last stage of the problem. If anything, that 11 months when the bubbling started only shows that the damage to the wall even happened sooner than 11 months, because it had to start working on the inside of the wall where the chemicals were, where the expansion started, and then finally it started working on the outside of the wall. So when we're talking about the outside date, in fact, that suggests that it happened even sooner. That's true with Maryland casualty. It's also true with employers that even tightens that two years to even less than two years. I think I'm running out of time, so I'm just going to real quickly say. All right. Unless, yeah, unless my colleagues have any additional questions, wrap it up. Okay. Thank you. We haven't spoken much about the fire loss. The judge basically just said there's some estimate that some guy did, which now we know was eight months after Mr. Jardine was paid this disputed amount, that the judge said this proves that he got paid in full. There are other estimates that contradict that. There's the settlement agreement that we're challenging that basically said he got paid for a bunch of releases. I think we've fully briefed that issue. There's major factual conflicts on that one. So for all those reasons that we've talked about this morning, I would ask that you reverse Judge Conte's decision on all four cases and allow Mr. Jardine a trial in this case. All right. Thank you both for your arguments in this matter. This matter will stand submitted and court will be in recess until tomorrow morning at 9 o'clock.
judges: Ripple, Fernandez, Callahan